UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CAMERON HOLBROOK, #382196,

        Petitioner,

v.                            CASE NO. 2:13-CV-11235
                                  HONORABLE SEAN F. COX

S. L. Burt,[1]

        Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

### I. INTRODUCTION

      Michigan prisoner Cameron Holbrook ("Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he is being held in custody in violation of his constitutional rights. Petitioner was convicted of first-degree murder and possession of a firearm during the commission of a felony following a jury trial in the Oakland County Circuit Court. He was sentenced, as a third habitual offender, to life imprisonment without the possibility of parole and a consecutive term of two years imprisonment on those convictions in 2008. This matter is before the Court on remand from the United States Court of Appeals for the Sixth Circuit, which reversed the Court's decision granting Respondent's motion for summary judgment and dismissing

---

[1]Petitioner is currently confined at the Muskegon Correctional Facility in Muskegon, Michigan where S. L. Burt is the warden. *See* Petitioner's Offender Profile, Michigan Department of Corrections Offender Tracking Information System ("OTIS"), http://mdocweb.state.mi.us/otis2profile.aspx?mdocNumber=382196. Accordingly, the Court hereby amends the caption for this case to the reflect the proper respondent. *See* 28 U.S.C. § 2243; 28 U.S.C. foll. § 2254, Rule 2(a).

the habeas petition as untimely under the one-year statute of limitations applicable to federal habeas actions.

In his pleadings, Petitioner raises 15 claims for relief concerning the admission of the victim's statements to police and his girlfriend, the sufficiency of the evidence, the effectiveness of trial and appellate counsel, the absence of counsel/right to counsel, the impartiality of the trial judge, the application of state procedural law, an alleged state jurisdictional defect, the conduct of the prosecutor, the trial court's questions to a witness, and cumulative error. Respondent contends that the claims are non-cognizable, barred by procedural default, and/or lack merit. Having reviewed the matter, the Court finds that Petitioner is not entitled to relief on his claims such that the habeas petition must be denied. The Court also finds that a certificate of appealability and leave to proceed *in forma pauperis* on appeal must be denied.

## II. FACTS AND PROCEDURAL HISTORY

Petitioner's convictions arise from the shooting death of Gary Nelson Jr. in September, 2007 in Pontiac, Michigan. The prosecution, on direct appeal, set forth a detailed summary of the trial testimony. The Court adopts those facts to the extent that they are consistent with the record.

During trial, Oakland County Deputy Medical Examiner Patrick Cho was qualified as an expert in the area of forensic pathology. (Tr I, 98). Cho performed the autopsy on the victim, Gary Nelson, Jr. (Tr I, 100). Nelson died on September 18, 2007 at 1:57 a.m. (Tr I, 100-101). The cause of Nelson's death was multiple gunshot wounds and the manner of death was homicide. (Tr I, 101). Cho identified seven gunshot wounds on Nelson which included:

(1) gunshot entered right upper shoulder and exited in the middle of his back
(2) gunshot entered mid torso and exited in the back
(3) gunshot entered right lateral flank and exited in the left inferior buttock
(4) gunshot entered right lower abdominal and exited left upper thigh
(5) gunshot entered mid lower abdomen and almost exited through

right lower thigh
(6) gunshot entered right lower flank and exited right hip
(7) gunshot entered palm of right hand and exited back of right wrist
[Tr I, 102-107].

Nelson tested negative for drugs. (Tr I, 107). Cho opined that the gunshot to Nelson's right hand was a defensive wound. (Tr I, 108).

Oakland County Detective Sergeant David Wurtz testified he reviewed telephone records from the Oakland County Jail. Telephone calls were made from the jail cells where Defendant had been housed to the phone number 313-465- 6102 [phone number of Clarence Cowen, Nelson's cousin], but Wurtz had no way of knowing if Defendant was actually the person placing the calls. (Tr I, 112-113, 122-123, 160-161).

Tashena Adams testified she was Nelson's girlfriend and they lived together in Pontiac. (Tr I, 126). Adams indicated that Clarence Cowen was Nelson's first cousin and Cowen's nickname was "Pig." (Tr I, 128). Nelson and Cowen did not have a good relationship. (Tr I, 128). Toward the end of July/early August 2007, Nelson was injured and had bruises, cuts and blood on his shirt. (Tr I, 129-130).

Adams testified that on September 17, 2007, Nelson received three or more calls around 10:30 p.m. (Tr I, 131). Nelson left the apartment but came back around 10:45-11:15 p.m. (Tr I, 133). After returning to the apartment, Nelson received two or three more phone calls. (Tr I, 133). Nelson left the apartment again and around 11:30 p.m. somebody knocked on her door and told Adams that her boyfriend had been shot. (Tr I, 133, 140-141). The shooting occurred in the parking lot of their apartment. (Tr I, 134). When Adams arrived at the parking lot, she saw Nelson lying on his back holding his abdomen. (Tr I, 134, 141). Nelson was right in front of the building, on the walkway near the front door. (Tr I, 141). The police were on the scene when Adams arrived. (Tr I, 142).

The prosecutor attempted to elicit Nelson's statement to Adams about where he was going the night in question and who he was going with. (Tr I, 131-132). Defense counsel objected and the trial court initially sustained the objection. (Tr I, 132). A short time later, the prosecutor, outside the presence of the jury, reiterated its request to admit Nelson's statements to Adams, under the present sense exception to the hearsay rule. (Tr I, 136-137). The trial court ruled that the state of mind of the declarant would be admissible to show a future act if a proper foundation was laid. (Tr I, 138).

In the presence of the jury, Adams reiterated that Nelson had received a series of phone calls on the night in question and that based on those phone calls, Nelson was planning on going out with a friend and have a drink. (Tr I, 139-140). Nelson said

he was going out with Kimmy or Cam. (Tr I, 140). Adams did not know a person named Kimmy or Cam. (Tr I, 140).

Defense counsel objected when the prosecutor asked Adams what Nelson said when she saw him after he was shot. (Tr I, 143). The prosecutor argued that the statements were admissible as a dying declaration or an excited utterance. (Tr I, 144). Outside the presence of the jury, the trial court asked defense counsel what foundation was missing for the admission of the statements. (Tr I, 144). Defense counsel indicated that the declarant must have been aware of his impending death. (Tr I, 144). The prosecutor responded that the foundation was laid by the type of injuries Nelson received as previously set forth by the medical examiner. (Tr I, 145). The trial court indicated that the foundation could be laid by looking at the totality of the circumstances surrounding the shooting. (Tr I, 146). The prosecutor responded that subsequent police testimony would show that the victim was gasping for breath and had a death stare when he implicated Defendant. (Tr I, 146). The trial court ruled that with the offer of proof, a proper foundation had been laid for the admission of Nelson's statement as a dying declaration. (Tr I, 147).

Adams testified she heard a police officer ask Nelson if he knew who shot him and Nelson relied "yes." (Tr I, 148). Nelson told the police officer that "Kimmy" shot me. (Tr I, 149). Nelson gave the police the make and model of a vehicle. (Tr I, 149). When Nelson was talking, he was experiencing shortness of breath. (Tr I, 150).

On cross-examination, defense counsel asked Adams if Nelson had ever talked to her about Kimmy before the night of the shooting and she responded that she had heard him talk about Kimmy. (Tr I, 151). Defense counsel impeached Adams with her preliminary examination testimony where she said she did not know Kimmy. (Tr I, 151). Adams said she had heard the name "Kimmy," but she did not know him. (Tr I, 152). On redirect, Adams indicated she told Nelson she did not know who Kimmy was and Nelson told her Kimmy was "Cam" and he had a brother named "Budgie" that Nelson grew up with. (Tr I, 154-155).

Gary Nelson Sr. [hereinafter "Nelson, Sr."] testified he was the victim's father. (Tr I, 157). Nelson, Sr. testified that his son was 25 years old when he died. (Tr I, 157). Nelson, Sr. indicated that Clarence Cowen was his nephew and Cowen was a drug dealer. (Tr I, 157-158). Nelson, Sr. had a conversation with Cowen and based on this conversation he believed there were problems between his son and Cowen. (Tr I, 159). Nelson, Sr.'s wife observed an altercation between her son and Cowen. (Tr I, 159). Cowen's nickname was "Pig." (Tr I, 159). Nelson, Sr. did not know where Cowen was currently residing. (Tr I, 160). Nelson, Sr. identified Cowen's voice on the disk admitted into evidence, Exhibit 2. Exhibit 2 contained taped recorded conversations originating from the Oakland County Jail to the number 313-465-6102. (Tr I, 112-113, 122-123, 160-161). Nelson, Sr. did not know Defendant but knew Budgie because he played football with Nelson. (Tr I, 162). Budgie had a

birthmark over his eye. (Tr I, 163).

Diana Nelson [hereinafter "Diana"] testified she was Nelson's mother. (Tr I, 166). Five or six weeks prior to Nelson's death, Diana saw an altercation between Nelson and Cowen. (Tr I, 167). Diana saw Cowen at the rear of a truck and his brother and cousin were trying to fight her son. (Tr I, 168). Once the fight was over, Cowen told his brother and cousin to get back in the truck and Cowen tried to run over Nelson with his truck. (Tr I, 168). Diana said she knew Budgie because he played football with her son when they were children. (Tr I, 169).

Pontiac Police Officer Don Russell testified that he was dispatched to the crime scene [63 Prall, Pontiac]. (Tr I, 172). Upon arriving at the scene, Russell saw Nelson lying on his back in a pool of blood with three gunshot wounds to the stomach area. (Tr I, 172, 177). Russell also observed a wound to Nelson's side. (Tr I, 178). Nelson had a "death stare" to his eyes and appeared to be dying at that point. (Tr I, 178). Russell was familiar with the "death stare" because he had seen it more than 50 times. (Tr I, 128). Russell also said he used to work at Pontiac Osteopathic Hospital [POH] with dead bodies. (Tr I, 178). When Russell asked Nelson questions, Russell had to yell a couple of times to bring him out of the stare. (Tr I, 179). The first question Russell asked Nelson was who shot him. (Tr I, 179). Russell had to yell the question at Nelson. (Tr I, 180). In a labored response, Nelson told Russell that "Kimmy" shot him. (Tr I, 180-181). Nelson described "Kimmy" as a 5'10" black male driving a green Fleetwood Cadillac. (Tr I, 181). Nelson was struggling for breath when he made his statements. (Tr I, 181). Nelson said there was another individual inside the green Cadillac. (Tr I, 182). Nelson said that "Kimmy" had a brother who had a patch over his eye and his brother's name was "Boogie." (Tr I, 182-183). Nelson was pronounced dead at 1:57 a.m. on September 18, 2007. (Tr I, 184).

Pontiac Police Officer Shawn Werner testified he was called to the crime scene on September 17, 2007. (Tr I, 187). Werner was standing over Nelson and Nelson was screaming. (Tr I, 188-189). Werner kept asking Nelson who shot him and Nelson said "Kimmy" shot him and "Kimmy" was a thin black male approximately 5' 10" tall. (Tr I, 189). Nelson said that Kimmy had a brother named Boogie that had a patch over his eye. (Tr I, 189). Werner received information that a green Cadillac was found at a gas station in Pontiac. (Tr I, 194). The vehicle was at the pumps but the individuals inside the vehicle had fled. (Tr I, 195).

Pontiac Police Officer Reuben Garcia testified that around 1:40-1:45 a.m. on September 18, 2007, he was advised that a green Cadillac matching the description of the vehicle from the homicide was in a gas station parking lot. (Tr I, 200). The crime scene was approximately 6-7 blocks from the gas station. (Tr I, 202). Less than ten minutes after Garcia received information about the green Cadillac being at the gas station, Garcia was flagged down by a gentleman by the name of Matt Williams

and Williams gave him some telephone numbers. (Tr I, 204). Garcia drove to the Newman Apartments because he had reason to believe the suspects may have been going there and he observed a black car pull out of the apartments at a high rate of speed. (Tr I, 205). The black car was never stopped. (Tr I, 205).

Pontiac Police Officer Ryan Roberts testified that around 1:30 a.m. the morning following the assault, he observed a green Cadillac parked at the gas pumps of a Sunoco Gas Station on Perry Street in Pontiac. (Tr I, 208) Roberts saw two heads in the front seat that appeared to belong to black males. (Tr I, 209). Roberts was suspicious because he had heard over the police radio that an older green Cadillac had been involved in the shooting on Prall Street. (Tr I, 209). By the time Roberts walked up to the car, 3-5 minutes after initially observing it, no one was inside the car. (Tr I, 209-211). The vehicle was impounded. (Tr I, 214).

Investigator Roland Garcia from the Oakland County Prosecutor's Office testified he was asked to and did obtain a photograph of Marquis Holbrook, born March 12, 1982. (Tr I, 218). Roland Garcia observed from the photograph that Marquis Holbrook had some type of mark over the right side of his eye up to his forehead. (Tr I, 220).

Brandy Whitbread testified that in September 2007, she owned a green four-door Cadillac. (Tr I, 223). In the middle of September 2007, Whitbread went to Pontiac intending to purchase crack cocaine. (Tr I, 223). In exchange for the cocaine, Whitbread "rented" her car to the person she bought the cocaine from. (Tr I, 225). Whitbread understood that she would get her car back in an hour and the person that "rented" her car wrote his phone number on a business card Whitbread gave him. (Tr I, 226). The individual that rented the car said his name was "Cam." (Tr I, 227). When Whitbread attempted to call the number on the card, she discovered it was not a valid number. (Tr I, 229). Approximately a week later, Whitbread received a call from the Pontiac Police about her car. (Tr I, 229-230).

Whitbread was shown a photographic lineup from Pontiac Police Detective Betts. (Tr I, 230). The photo array was admitted as an exhibit. (Tr I, 231). Whitbread was asked to pick out the person she gave her business card to. (Tr I, 232). Initially Whitbread picked out #4 in the lineup but then told the police that the suspect could possibly have been #2. (Tr I, 232). Whitbread was shown two other photo lineups. (Tr I, 233-234). Whitbread picked out #5 from another lineup but was not sure why she knew the person. (Tr I, 234). Whitbread admitted that she picked out people from the lineups that looked familiar to her but she did not know whether she gave her business card to those people. (Tr I, 236).

Michigan State Trooper Jacob Liss testified that on September 18, 2007, around 11:15 a.m., he was on duty and patrolling I-94. (Tr I, 240, 241). Liss was on I-94 near Greenfield when he executed a traffic stop of a black Chevy Monte Carlo

two-door traveling eastbound with expired plates and tinted windows. (Tr I, 240). Three occupants were in the vehicle, a male driver and back seat passenger and a female front seat passenger. (Tr I, 241). The female passenger was wearing pajamas. (Tr I, 241). The back seat passenger was Defendant. (Tr I, 243). Defendant told the officer his name was Demetrius Miller. (Tr I, 244). None of the people in the car had a valid driver's license. (Tr I, 244). The female passenger was the registered owner of the car. (Tr I, 245). The vehicle was towed and the last time Liss saw Defendant he was walking down the ramp to Greenfield to get a ride. (Tr I, 245). Later that day Liss was contacted by personnel of the Pontiac Police Department and provided the information he knew about the car and occupants to the Pontiac Police. (Tr I, 246).

Bridget Goodman testified that in September 2007, she lived at 54 South Tasmania in Pontiac and she owned a 1996 black Monte Carlo. (Tr I, 247, 255). Goodman was Defendant's girlfriend and had been for five years. (Tr I, 248). Defendant had a brother named Marquis but he was sometimes called "Budgie." (Tr I, 256). Marquis had a birth mark over his eye. (Tr I, 256). In September 2007, Defendant was staying with Goodman mostly every night. (Tr I, 249). Goodman's phone number was 248-338-0379. (Tr I, 249). Goodman denied that Defendant ever went by the name of "Kimmy," but admitted she told Detective Betts that she had heard that people used to call him "Kimmy." (Tr I, 259-260).

On September 17, 2007, Defendant arrived at Goodman's house around 9:00 p.m. (Tr I, 250). Defendant left the house later that night to go to the store for Goodman's mother but he returned before Goodman fell asleep. (Tr I, 251). When Goodman eventually fell asleep, Defendant was at her house. (Tr I, 253). Around 2:00 a.m., Defendant called Goodman on the phone and asked her to pick him up outside the Newman Apartments. (Tr I, 253-254). When Goodman picked up Defendant he wanted to visit his cousin [Yamisha Brown] in Detroit so Goodman drove Defendant to Detroit. (Tr I, 256-257). Goodman testified that she fell asleep ten minutes after she arrived at Brown's house and slept until 9:00 a.m. the next morning. (Tr I, 262). Goodman testified that in the morning, she went with Defendant and his cousin to get something to eat, and they were pulled over by the police. (Tr I, 262). Goodman said that on the way to get something to eat, she got the tires changed on her car. (Tr I, 263). Goodman indicated it was a rare occurrence that she drove to Detroit without a license. (Tr I, 265).

Goodman testified that Defendant was no longer her boyfriend even though he called her often after he was incarcerated. (Tr I, 268). Goodman knew Defendant had been on the run for murder and had left the state. (Tr I, 271). Goodman did not know that Defendant was in Tennessee. (Tr I, 275). Goodman denied knowing anyone by the name of Clarence Cowen or "Pig." (Tr I, 275). Between September 7, 2007 and October 10, 2007, there are 30 contacts between Goodman's telephone number and 313-465-6102, a number she did not recognize, but belonged to Cowen. (Tr I, 112-113; 275-276). Goodman left for Tennessee on September 19, 2007. (Tr I, 277).

Goodman had no contact with Defendant for a two week period when she was in Tennessee which was unusual. (Tr I, 277-278). On cross-examination, Goodman testified she had seen Michael Pepper in a Cadillac but she had never seen Defendant with Pepper. (Tr I, 281-282).

Yamisha Brown testified that Defendant is her cousin. (Tr II, 5). Defendant and Goodman stopped to visit her during the early morning hours one day in September 2007. (Tr II, 7). Brown was up for 5-10 minutes after Defendant arrived but then she went back to sleep. (Tr II, 9). The next morning Brown was up early and went to work. (Tr II, 10-11). Brown denied telling the police that she had yelled at Defendant for 45 minutes about coming over in the middle of the night. (Tr II, 10). Brown also denied that she told the police that prior to Defendant's visit she had not seen him for a while. (Tr II, 15).

Ralph McMorris testified he was currently incarcerated in the Michigan Department of Corrections. (Tr II, 23). In September 2007, McMorris was out on parole. (Tr II, 24). His cell phone number was 248-499-2734. (Tr II, 24). During the middle of the month, after having a fight with his girlfriend, McMorris was walking the streets of Pontiac, smoking a cigarette. (Tr II, 25). Two black males approached McMorris and asked if he had a phone they could use and asked for a cigarette. (Tr II, 26). McMorris identified Defendant as one of the individuals that approached him. (Tr II, 27). The other gentleman with Defendant used McMorris' phone to make several calls. (Tr II, 27, 32). McMorris admitted he had eight criminal convictions, mostly for theft type crimes. (Tr II, 28). McMorris denied being promised anything for his testimony. (Tr II, 31). When McMorris met Defendant, they were approximately 1/4 mile from the Newman Apartments. (Tr II, 34). McMorris spent approximately 10-15 minutes with Defendant and Defendant said he had family in Connecticut and he might have to go there. (Tr II, 34). Defendant was born in Connecticut. (Tr I, 18). After Defendant left, McMorris saw a police car with a flashing light go by and McMorris asked the police officer if he was looking for some guys. (Tr II, 35). McMorris told the police he had just seen some guys that may have done something. (Tr II, 35). Approximately 5-10 minutes elapsed from when Defendant left and when McMorris saw the police. (Tr II, 36).

Pontiac Police Detective Donald Gracey, Jr. testified that on the night of the shooting, he received a phone call about the shooting and was asked to come into work and start the investigation. (Tr II, 74). Gracey and his partner Detective Betts went to the crime scene [63 Prall], conducted a review of the scene and then went to POH. (Tr II, 75). Thereafter, Gracey went to a gas station at 1144 North Perry because a green Cadillac fitting the description of the vehicle possibly involved in the homicide was at that location. (Tr II, 76). Gracey later went to 54 South Tasmania in search of information about the suspects. (Tr II, 77). The police had consent from the homeowner to search for possible suspects. (Tr II, 77). Gracey and Betts contacted McMorris in an attempt to show him photographs of possible

suspects but McMorris was slightly intoxicated and took off running. (Tr II, 79).

Gracey tried to locate Defendant for three days after the shooting with no success. (Tr II, 81). Gracey said he spoke to Brown a few days after the shooting and her testimony in court was inconsistent with what she had earlier told him. (Tr II, 81-82). Brown told Gracey that she was quite upset when Defendant and Goodman showed up at her house at 3:00 a.m. (Tr II, 82).

Gracey had information that Defendant left the state after the shooting. On September 29, 2007, Gracey received information that Defendant had been in Tennessee and was returning to Michigan the next afternoon via a Greyhound bus and would be arriving at the Detroit Howard Street bus location. (Tr II, 84, 85). Gracey did not see anyone matching Defendant's description get off the bus and was leaving the bus terminal when he saw two African American males walking down the street coming from the area of the bus station. (Tr II, 86). Gracey went up to the individuals and one of the individuals, the one Gracey identified in court as Defendant, told Gracey that his name was Demetrius Millery. (Tr II, 87). Gracey knew from police reports that Defendant had previously identified himself as Demetrius Millery. (Tr II, 89). Defendant told Gracey that the police must know his real name because the picture Gracey was holding up was a picture of him. (Tr II, 89).

Gracey indicated that the cell phone number 248-242-2073 belonged to Michael Pepper, 248-338-0379 belonged to Goodman, and 248-563-4848 belonged to Adams. (Tr II, 91-93). At 10:09:24 p.m. on the date of the shooting, Adam's phone received an incoming call from 248-242-2073, the number belonging to Michael Pepper. (Tr II, 95-96). An outgoing call from Adam's cell phone to Pepper's cell phone occurred at 10:17:40 p.m. (Tr II, 97). At 10:34:37 p.m., Adam's phone received an incoming call from Pepper's phone. (Tr II, 98). The police, the Fugitive Investigation Team and the United States Marshall all attempted to locate Pepper but to no avail. (Tr II, 98, 177-180).

At 10:19:13 p.m., a phone call was made from Pepper's phone to Clarence Cowen's phone. (Tr II, 103-105). Another call between Pepper and Cowen occurred around midnight. (Tr II, 107-108). From McMorris' phone, Goodman's phone was called at 1:44:10 a.m. and Pepper's phone was also called. (Tr II, 109-110). Between September l, 2007 and October 31, 2007, 25-30 phone calls were exchanged between Goodman's phone and Cowen's phone. (Tr II, 112).

Goodman's police statement was played for the jury due to her prior inconsistent statements. (Tr II, 116-118). During Goodman's taped interview with the police, she indicated she had heard that Defendant was called Kimmy, but he stopped using that name. (Tr II, 122). Defendant went by the name of Kimmy 15-16 years earlier and his mother and entire family called him Kimmy. (Tr II, 123, 146). Defendant was

currently known as Cam. (Tr II, 124). The Friday after the shooting, Goodman went to Tennessee to visit her sister. (Tr II, 131-132). Goodman told the police that when she was pulled over, a guy by the name of Lamont was driving and Demetrius was in the back seat. (Tr II, 139). Goodman told the police she went with Defendant to Detroit the day after the shooting, during daylight hours. (Tr II, 154).

Pros. Brf. on App., pp. 1–12.

Following his convictions and sentencing, Petitioner filed an appeal of right with the

Michigan Court of Appeals raising the following claims through counsel:

I. The admission of decedent's alleged statements to police under the dying declaration exception to the Confrontation Clause did not fit within that exception because the prosecution failed to show that they were based on personal knowledge.

II. The trial court reversibly erred in permitting testimony that the deceased told his girlfriend before leaving that he was going out with "Kimmy" for a drink and denying a request for a limiting instruction where state of mind was not material, violating Petitioner's constitutional rights to confrontation and due process.

III. The prosecution failed to produce legally sufficient evidence of Petitioner's guilt beyond a reasonable doubt, both in terms of who shot the decedent and/or the essential elements of premeditation.

Petitioner also filed a pro per supplemental brief on appeal raising the following claims of

ineffective assistance of trial counsel:

I. Petitioner was denied his constitutional right to the effective assistance of counsel at trial where counsel failed to object to the prosecutor's repeated use of bad acts evidence, failed to object to repeated references to Petitioner being in custody, failed to object to introduction of evidence that Petitioner had a probation officer and fingerprint cards, and failed to request a special cautionary instruction on drug addict informer and perjured testimony.

The court denied relief on those claims and affirmed Petitioner's convictions. *People v. Holbrook*,

No. 287383, 2010 WL 99010 (Mich. Ct. App. Jan. 10, 2010) (unpublished). Petitioner then filed

an application for leave to appeal with the Michigan Supreme Court, which was denied. *People v.*

*Holbrook*, 486 Mich. 931, 781 N.W.2d 836 (May 25, 2010).

On May 19, 2011, Petitioner filed a pro se motion for relief from judgment and supplemental brief with the state trial court raising the following claims:

I.   The complete deprivation of counsel Petitioner suffered at a critical stage of the proceedings when his attorney was completely absent from the prosecution's adversarial motion hearing in which the prosecutor sought to introduce critical/highly prejudicial telephone records that tended to inculpate constitutes structural error and requires automatic reversal, without the showing of actual prejudice.

II.  The trial judge pierced the veil of judicial impartiality, because throughout the proceedings on multiple occasions his actions strongly suggested to the jury that he favored the prosecution's theory.

   (A) The trial court's characterization of Gary Nelson Jr., as an actual "victim" during voir dire of prospective jurors in the presence of the deliberating jurors amounted to a prejudgment of the case that pervaded the entire trial because the judge's actions created presumptions in favor of the prosecution.

   (B) The trial court's instructions which classified Gary Nelson Jr., took away essential elements of the offense which alleviated the prosecution's burden of proof, overemphasized the prosecution's theory, and invaded the province of the jury because the jury was only left with having to decide the identity of the perpetrator who caused Gary Nelson Jr. to become a victim.

III. The evidence is insufficient to uphold the convictions due to the prosecution's complete failure to prove one of the essential elements of the crime beyond a reasonable doubt, to wit: venue (time and place) of the offenses, as required by law, because the evidence merely showed that the alleged crime occurred in the general area of 63 Prall Street, City of Pontiac, but the evidence does not show that the general area of 63 Prall Street, City of Pontiac is within the County of Oakland as required. The prosecutor never event attempted to ask any witness what county the offenses occurred in.

IV.  Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel on appeal due to counsel ignoring significant, obvious, and meritorious issues and due to counsel's omission of "dead bang winners" on appeal, which are far more stronger than the issues raised.

V.      The good cause requirement is satisfied in this case because appellate counsel's ineffectiveness on direct appeal of right prevented Petitioner from raising the issues which are being raised herein, on the motion for relief from judgment, during his direct appeal of right. The only recourse available is to raise the remaining issues that were omitted by appellate counsel is to raise them at the motion for relief from judgment stage.

VI.     The constitutional violation involving the complete deprivation of counsel, constitutes a "jurisdictional defect" therefore "good cause" and "actual prejudice" standards are inapplicable in this regard.

VII.    The actual prejudice requirement is also satisfied in the case at bar because, but for some of the errors raised herein, Petitioner would have had a reasonable likely chance of acquittal, and since structural error resulted from some of the issues raised herein, some of the irregularities were so offensive to the maintenance of a sound judicial process that the convictions cannot be allowed to stand regardless of their effect on the outcome of the case.

VIII.   Trial counsel's multiple deficiencies effectively served to deprive Petitioner of his constitutional right to the effective assistance of counsel.

(A) Counsel's admission, without consent, that Petitioner was indeed present at the scene of the crime when Gary Nelson Jr., was purportedly murdered, when there was a complete absence of any conclusive evidence to place him at the scene constitutes deficient performance, and prejudice resulted especially since Petitioner never conceded to anyone that he was present and declared that he was not present.

(B) Counsel's complete failure to produce and introduce into evidence, to sustain Petitioner's declarations of innocence, competent evidence of Petitioner's substantially shorter height in comparison to the actual height of the perpetrator provided by Gary Nelson Jr. constitutes deficient performance which prejudiced Petitioner since counsel's inactions prevented him from proving his innocence.

(C) Counsel's complete failure to even attempt to interview any exculpatory witnesses prior to trial who would have countered the prosecution's case constitutes deficient performance and prejudice resulted because the prosecution's case went virtually un-rebutted, when counsel did not produce one exculpatory defense witness.

(D) Counsel's failure to ensure that Petitioner's rights were adequately protected by failing to ensure that the jury received proper

instructions concerning the allegations of his "crack" dealing, constitutes ineffective assistance and prejudice resulted because in light of the insubstantial evidence, there's a great probability that he was convicted merely because the jury believed he was a "crack" dealer, in the absence of proper instructions on how to handle such highly prejudicial allegations.

(E) Counsel's complete failure to investigate and consult an expert witness to have the handwriting on back of a card handed to a prosecution's witness purportedly by Petitioner analyzed constitutes deficient performance because the results of the analysis would have showed that the handwriting was not consistent with Petitioner's handwriting, contrary to the prosecution's assertions, thereby exonerating him.

IX.     The multiple instances of prosecutorial misconduct effectively served to deprive Petitioner of his right to a fair trial.

(A) The prosecutor's multiple instances of vouching for the veracity of its witness's testimony deprived Petitioner of his right to fair trial.

(B) The prosecutor's argument that Petitioner was the individual positioned in the Number 4 spot in the photo lineup that its witness selected as being the individual who gave crack cocaine in exchange for her vehicle, the vehicle allegedly used during the commission of the offenses, constitutes arguing facts not in evidence, because there was absolutely no evidence on the record that Petitioner was even in the lineup, effectively deprived Petitioner of his right to due process.

(C) Counsel was constitutionally ineffective for failing to protect Petitioner's rights by failing to object.

X.      Petitioner was deprived of his Sixth Amendment right to be present during all critical stages of the proceedings when the court received questions and answered questions of the deliberating jurors outside of his presence when Petitioner never waived his right to be present.

XI.     (A) Petitioner was deprived of his right to due process when the trial court unnecessarily interfered during trial and asked the prosecution's witness, who testified that he had previously interviewed Petitioner, his occupation and the witness identified himself as a probation officer, because the witness's occupation was not only utterly non-probative to any question of fact but it also clearly informed the jurors that Petitioner had at minimum been arrested in another criminal matter and was on probation, thereby rendering the trial

fundamentally unfair.

(B) Counsel was constitutionally ineffective for failing to object.

XII.    The cumulative effect of the errors set forth above deprived Petitioner of due process guaranteed under the United States and Michigan Constitutions.

The court denied relief on those claims finding that Petitioner failed to establish cause or prejudice for his failure to raise the claims on direct appeal, failed to show that he was actually innocent, and denied relief pursuant to Michigan Court Rule 6.508(D)(3). *People v. Holbrook*, No. 07-218017-FC (Oakland Co. Cir. Ct. June 3, 2011). Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, which was denied "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Holbrook*, No. 308678 (Mich. Ct. App. Nov. 8, 2012) (unpublished). Petitioner did not timely seek leave to appeal with the Michigan Supreme Court. *See* Affidavit of Larry Royster, Michigan Supreme Court Clerk, dated July 1, 2013.

Petitioner dated his initial federal habeas petition on March 1, 2013 and it was filed by the Court on March 20, 2013. He then dated an additional habeas petition on April 24, 2013, which was filed by the Court on April 29, 2013.[2] In his petition, he raises the following claims as grounds for habeas relief:

I.    The admission of decedent's alleged statements to police under the dying declaration exception to the Confrontation Clause did not fit within that exception because the prosecution failed to show that they were based on personal knowledge.

---

[2]It is well-established that "an amended complaint supersedes all prior complaints." *Drake v. City of Detroit*, 266 F. App'x 44, 448 (6th Cir. 2008); *see also Pacific Bell Tel. Co. v. Linkline Comm., Inc.*, 555 U.S. 438, 456 n. 4 (2009) ("Normally, an amended complaint supersedes the original complaint."); *Calhoun v. Bergh*, 769 F.3d 409, 410 (6th Cir. 2014) (amended habeas petition supercedes prior petition "for all purposes"). The Court shall thus consider the claims listed in the habeas petition filed on April 29, 2013.

II.    The trial court reversibly erred in permitting testimony that the deceased told his girlfriend before leaving that he was going out with "Kimmy" for a drink and denying a request for a limiting instruction where state of mind was not material, violating Petitioner's constitutional rights to confrontation and due process.

III.   The prosecution failed to produce legally sufficient evidence of Petitioner's guilt beyond a reasonable doubt, both in terms of who shot the decedent and/or the essential elements of premeditation.

IV.    Petitioner was denied his constitutional right to the effective assistance of counsel at trial where counsel failed to object to the prosecutor's repeated use of bad acts evidence, failed to object to repeated references to Petitioner being in custody, failed to object to introduction of evidence that Petitioner had a probation officer and fingerprint cards, and failed to request a special cautionary instruction on drug addict informer and perjured testimony.

V.     The complete deprivation of counsel Petitioner suffered at a critical stage of the proceedings when his attorney was completely absent from the prosecution's adversarial motion hearing in which the prosecutor sought to introduce critical/highly prejudicial telephone records that tended to inculpate constitutes structural error and requires automatic reversal, without the showing of actual prejudice.

VI.    The trial judge pierced the veil of judicial impartiality, because throughout the proceedings on multiple occasions his actions strongly suggested to the jury that he favored the prosecution's theory.

       (A) The trial court's characterization of Gary Nelson Jr., as an actual "victim" during voir dire of prospective jurors in the presence of the deliberating jurors amounted to a prejudgment of the case that pervaded the entire trial because the judge's actions created presumptions in favor of the prosecution.

       (B) The trial court's instructions which classified Gary Nelson Jr., took away essential elements of the offense which alleviated the prosecution's burden of proof, overemphasized the prosecution's theory, and invaded the province of the jury because the jury was only left with having to decide the identity of the perpetrator who caused Gary Nelson Jr. to become a victim.

VII.   The evidence is insufficient to uphold the convictions due to the prosecution's complete failure to prove one of the essential elements of the crime beyond a reasonable doubt, to wit: venue (time and place) of the

offenses, as required by law, because the evidence merely showed that the alleged crime occurred in the general area of 63 Prall Street, City of Pontiac, but the evidence does not show that the general area of 63 Prall Street, City of Pontiac is within the County of Oakland as required. The prosecutor never even attempted to ask any witness what county the offenses occurred in.

VIII.   Petitioner was deprived of his Sixth Amendment right to the effective assistance of counsel on appeal due to counsel ignoring significant, obvious, and meritorious issues and due to counsel's omission of "dead bang winners" on appeal, which are far more stronger than the issues raised.

IX.     The good cause requirement is satisfied in this case because appellate counsel's ineffectiveness on direct appeal of right prevented Petitioner from raising the issues which are being raised herein, on the motion for relief from judgment, during his direct appeal of right. The only recourse available is to raise the remaining issues that were omitted by appellate counsel is to raise them at the motion for relief from judgment stage.

X.      The constitutional violations involving the complete deprivation of counsel, constitutes a "jurisdictional defect" therefore "good cause" and "actual prejudice" standards are inapplicable in this regard.

XI.     The actual prejudice requirement is also satisfied in the case at bar because but for some of the errors raised herein, Petitioner would have had a reasonable likely chance of acquittal, and since structural error resulted from some of the issues raised herein, some of the irregularities were so offensive to the maintenance of a sound judicial process that the convictions cannot be allowed to stand regardless of their effect on the outcome of the case.

XII.    Trial counsel's multiple deficiencies effectively served to deprive Petitioner of his constitutional right to the effective assistance of counsel.

(A) Counsel's admission, without consent, that Petitioner was indeed present at the scene of the crime when Gary Nelson Jr., was purportedly murdered, when there was a complete absence of any conclusive evidence to place him at the scene constitutes deficient performance, and prejudice resulted especially since Petitioner never conceded to anyone that he was present and declared that he was not present.

(B) Counsel's complete failure to produce and introduce into evidence, to sustain Petitioner's declarations of innocence, competent evidence of Petitioner's substantially shorter height in comparison to the actual height of the perpetrator provided by Gary Nelson Jr.,

constitutes deficient performance which prejudiced Petitioner since counsel's inactions prevented him from proving his innocence.

(C) Counsel's complete failure to even attempt to interview any exculpatory witnesses prior to trial who would have countered the prosecution's case constitutes deficient performance and prejudice resulted because the prosecution's case went virtually un-rebutted, when counsel did not produce one exculpatory defense witness.

(D) Counsel's failure to ensure that Petitioner's rights were adequately protected by failing to ensure that the jury received proper instructions concerning the allegations of his "crack" dealing, constitutes ineffective assistance and prejudice resulted because in light of the insubstantial evidence, there's a great probability that he was convicted merely because the jury believed he was a "crack" dealer, in the absence of proper instructions on how to handle such highly prejudicial allegations.

(E) Counsel's complete failure to investigate and consult an expert witness to have the handwriting on back of a card handed to a prosecution's witness purportedly by Petitioner analyzed constitutes deficient performance because the results of the analysis would have showed that the handwriting was not consistent with Petitioner's handwriting, contrary to the prosecution's assertions, thereby exonerating him.

XIII. The multiple instances of prosecutorial misconduct effectively served to deprive Petitioner of his right to a fair trial.

(A) The prosecutor's multiple instances of vouching for the veracity of its witness's testimony deprived Petitioner of his right to fair trial.

(B) The prosecutor's argument that Petitioner was the individual positioned in the Number 4 spot in the photo lineup that its witness selected as being the individual who gave crack cocaine in exchange for her vehicle, the vehicle allegedly used during the commission of the offenses, constitutes arguing facts not in evidence, because there was absolutely no evidence on the record that Petitioner was even in the lineup, effectively deprived Petitioner Holbrook of his right to due process.

(C) Counsel was constitutionally ineffective for failing to protect Petitioner's rights by failing to object.

XIV.   (A) Petitioner was deprived of his right to due process when the trial court unnecessarily interfered during trial and asked the prosecution's witness, who testified that he had previously interviewed Petitioner, his occupation and the witness identified himself as a probation officer, because the witness's occupation was not only utterly non-probative to any question of fact but it also clearly informed the jurors that Petitioner had at a minimum been arrested in another criminal matter and was on probation, thereby rendering the trial fundamentally unfair.

(B) Counsel was constitutionally ineffective for failing to object.

XV.   The cumulative effect of the errors set forth above deprived Petitioner of due process guaranteed under the United States and Michigan Constitutions.

Initially, Respondent moved for summary judgment contending that the habeas petition was untimely under the one-year statute of limitations applicable to federal habeas actions. The Court granted that motion and dismissed the habeas petition as untimely. *Holbrook v. Curtin*, 2014 WL 65229 (E.D. Mich. Jan. 8, 2014). The Sixth Circuit, however, reversed that decision, and remanded the case for further proceedings. *Holbrook v. Curtin*, 833 F.3d 612 (6th Cir. 2016). The United States Supreme Court denied the State's petition for a writ of certiorari. *Woods v. Holbrook*, _ U.S. _, 137 S. Ct. 1436 (2017). This Court thereafter reopened the case and ordered supplemental briefing by the parties. Respondent has since filed an answer to the habeas petition contending that the claims are not cognizable, barred by procedural default, and/or lack merit. Petitioner has filed a reply to that answer.

### III. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., became effective on April 24, 1996. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2241 *et seq*., sets forth the standard of review that federal courts must use when considering habeas petitions brought by prisoners

challenging their state court convictions. The AEDPA provides in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court

decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*; *see also White v. Woodall*, 572 U.S. 415, 419-20 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, _ U.S. _, 135 S. Ct. 1372, 1376 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, _ U.S. _, 136 S. Ct. 1149, 1152 (2016).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles*

*v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. The requirements of clearly established law are to be determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

# IV. DISCUSSION

**A.     Direct Appeal Claims**

     1.    <u>Admission of Victim's Statements to Police</u>

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in admitting statements that the victim made to the police shortly before he died, i.e., that a black man named "Kimmy" shot him and that he was driving in a green Fleetwood Cadillac with another man. Petitioner asserts that the admission of those statements as a dying declaration violated his confrontation rights and state evidentiary law because the prosecution failed to show that the statements were based upon personal knowledge. Respondent contends that this claim is procedurally defaulted and is not cognizable on habeas review.

Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dept. of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness" may it violate due process and warrant habeas relief. *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519-20 (6th Cir. 2007)); *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Estelle*, 502 U.S. at 69-70).

The Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause provides criminal defendants the right to confront and cross-examine witnesses against them. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 315 (1973). The right to confront adverse witnesses generally

prevents a court from admitting an out-of-court statement against a criminal defendant. *California v. Green*, 399 U.S. 149, 155-58 (1970). The Sixth Amendment protections, however, are not so broad as to exclude the admission of all hearsay statements against a defendant despite his or her inability to confront the declarant at trial. *See Maryland v. Craig*, 497 U.S. 836, 847-48 (1990). The constitutionality of admitting a hearsay statement depends on whether the statement is testimonial or non-testimonial in nature and on the circumstances surrounding the making of the statement.

The Michigan Court of Appeals reviewed this claim for plain error[3] on direct appeal and denied relief. The court ruled that the admission of the victim's statements to police did not violate Petitioner's confrontation rights and found that the statements were based upon personal knowledge such that they were properly admitted under state law. The court explained in part:

> ...because dying declarations are recognized as an historical exception to the Confrontation Clause, defendant's constitutional argument is misplaced. *People v. Geracer Taylor*, 275 Mich. App. 177, 183; 737 N.W.2d 790 (2007) (citing *Crawford v. Washington*, 541 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d 177 (2004)).
>
> ***
>
> Defendant claims that the declarant of a dying declaration under MRE 804(b)(2) must also meet the personal knowledge requirement of MRE 602. Specifically, defendant asserts that the prosecution failed to prove that Nelson's statements were not merely speculation, as opposed to being based on personal knowledge.
>
> ***
>
> We conclude that the plain language of MRE 804 does not preclude the application of MRE 602. Therefore, in order for a dying declaration to be admissible, the declarant must possess personal knowledge related to the statement. However, personal knowledge can be presumed as long as there was evidence to show that the declarant "was in a position to know the fact stated." *Wilborn, supra* at 287 (citation

---

[3]The Court reviewed this claim for plain error because the defense objection to this evidence at trial was not based upon the victim's alleged lack of personal knowledge, but rather his alleged lack of awareness of his pending death.

omitted). Consequently, if it was "manifestly impossible" for a declarant to have known such facts, then the statement is mere opinion and not admissible. *Id.* (citation omitted).

Nelson was shot seven times. Most of the entry wounds were located in the front of his body. This would support an inference that Nelson was facing his attacker and had an opportunity to observe him. In addition, Nelson was also shot in his right hand, which is indicative of a defensive posture. A reasonable inference is that Nelson saw his attacker during the shooting and raised his hand to ward off the attacker. Furthermore, there existed additional evidence that Nelson's statement was not a mere opinion. Nelson was very specific regarding the details of his shooter. He told the police that the shooter was "Kimmy," who was in a green Cadillac with another black man. The fact that Nelson was able to speak in such specific terms regarding the vehicle used and how many others were with defendant that night supports an inference that Nelson's statements were based on his personal knowledge and direct observation. Consequently, the necessity of meeting any requirements mandated by MRE 602 are satisfied since there was sufficient evidence to support a finding that Nelson had personal knowledge of his shooter. Therefore, the trial court did not err in admitting the statement.

*Holbrook*, 2010 WL 99010 at *1-2 (footnote and explanatory state law omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, to the extent that Petitioner challenges the admission of the victim's statements to the police under the Michigan Rules of Evidence, he merely alleges a violation of state law which does not entitle him to federal habeas relief. *See Walker v. Harry*, 462 F. App'x 543, 545 (6th Cir. 2012); *Wheeler v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003). A federal court may grant an application for writ of habeas corpus only on the ground that the petitioner is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67-68. State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("a state court's

interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review."); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Petitioner is not entitled to habeas relief based upon a perceived violation of Michigan law concerning the admission of this evidence.

Second, to the extent that Petitioner alleges a constitutional violation, he is not entitled to relief. The victim's statements to police were properly admitted as a dying declaration under an exception to the hearsay rule under state law. And, contrary to Petitioner's claim, those statements were based upon the victim's personal knowledge of the circumstances of the shooting given that his injuries showed he was facing the shooter and given the specificity of his description. The statements were also made when the victim believed that his death was imminent given the nature and extent of his injuries and his deteriorating physical condition. Petitioner fails to demonstrate that the admission of this evidence rendered his trial fundamentally unfair.

Petitioner is also not entitled to habeas relief on his claim that the admission of the victim's statements to police violated his confrontation rights. In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held that out-of-court statements which are testimonial in nature are barred by the Confrontation Clause of the Sixth Amendment if the declarant is unavailable at trial and the defendant did not have a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. The Supreme Court, however, indicated that dying declarations may be an historical exception to this rule. *Id.* at 56 n. 6. The Supreme Court also confirmed that the rule of forfeiture by wrongdoing, i.e., that a defendant may not benefit from his wrongful prevention of a witness's future testimony, extinguishes confrontation claims on equitable grounds. *Id.* at 62; *see also* Mich. R. Evid. 804(b)(6).

The Supreme Court has yet to definitively rule on the status of dying declarations under the Confrontation Clause. *See Michigan v. Bryant*, 562 U.S. 344, 351, n.1 (2011); *see also Walker*, 462 F. App'x at 545-46 (explaining that "[i]n *Crawford* and again in *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008), the Supreme Court hinted that dying declarations may fall within an exception to the constitutional bar against testimonial hearsay"). Since *Crawford*, several courts have found a Confrontation Clause exception for dying declarations, *see, e.g., Kennedy v. Coleman*, No. 1:15-cv-684, 2016 WL 7475649, *9 (S.D. Ohio Dec. 29, 2016); *Duncan v. Bobby*, No. 1:07 CV 839, 2008 WL 111229, *8 (N.D. Ohio Jan. 8, 2008); *People v. Taylor*, 275 Mich. App. 177, 182-83, 737 N.W.2d 790 (2007), but some have not. *See, e.g., United States v. Jordan*, No. 04-CR-229-B, 2005 WL 513501, *3 (D. Colo. March 3, 2005). Most courts have concluded that the issue is unresolved. *See, e.g., Walker*, 462 F. App'x at 545-46; *Martin v. Fanies*, 365 F. App'x 736, 739 (5th Cir. 2010); *United States v. Littlesun*, 444 F.3d 1196, 1199 (9th Cir. 2006); *Taylor v. Prelesnik*, No. 09-cv-14214, 2011 WL 4694055, *3-4 (E.D. Mich. Oct. 5, 2011) (citing cases). This Court agrees that the issue remains unresolved by the Supreme Court. Consequently, Petitioner cannot prevail on this claim as he cannot establish that the state court's decision is contrary to or an unreasonable application of clearly-established Supreme Court precedent. A state court cannot act unreasonably under AEDPA if the Supreme Court has not decided a question. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam) (reversing grant of habeas relief because Supreme Court precedent provided "no clear answer to the question presented"); *Walker*, 462 F. App'x at 545-46; *Taylor*, 2011 WL 4694055 at *3 (citing cases).

Moreover, several courts, including the Sixth Circuit, have recognized the continuing viability of forfeiture by wrongdoing doctrine. *See, e.g., United States v. Garcia-Meza*, 403 F.3d

364, 370 (6th Cir. 2005) (upholding admission of murder victim's police statement about defendant's prior abuse); *Mayhew*, 380 F. Supp. 2d at 966-68 (admitting victim's dying declaration); *People v. Bauder*, 269 Mich. App. 174, 185-87, 712 N.W.2d 506 (2005) (citing *Garcia-Meza* and upholding admission of murder victim's statements). Given that the victim was unable to testify at trial due to Petitioner's wrongful conduct, it cannot be said that the admission of his statements violated due process or otherwise rendered Petitioner's trial fundamentally unfair. Habeas relief is not warranted on this claim.[4]

### 2. Admission of Victim's Statements to His Girlfriend

Petitioner next asserts that he is entitled to habeas relief because the trial court erred in admitting the victim's statement to his girlfriend that he was meeting Petitioner on the night of the shooting. Petitioner asserts that the admission of this evidence violated his confrontation rights and state evidentiary rules. Respondent contends that this claim is not cognizable on habeas review and that it lacks merit.

As discussed, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle*, 502 U.S. at 67-68; *Serra*, 4 F.3d at 1354. Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness" may it violate due process and warrant habeas relief. *Bugh*, 329 F.3d at 512; *see also Wynne*, 606 F.3d at 871; *McAdoo*, 365 F.3d at 494.

Also, as discussed, the Confrontation Clause provides criminal defendants the right to confront and cross-examine witnesses against them. *Davis*, 415 U.S. at 315. The right to confront adverse witnesses generally prevents a court from admitting an out-of-court statement against a

---

[4]Given this determination, the Court need not address the procedural default issue.

criminal defendant. *California*, 399 U.S. at 155-58. The Sixth Amendment protections, however, are not so broad as to exclude the admission of all hearsay statements against a defendant despite his or her inability to confront the declarant at trial. *Maryland*, 497 U.S. at 847-48. The constitutionality of admitting a hearsay statement depends on whether the statement is testimonial or non-testimonial in nature and on the circumstances surrounding the making of the statement.

The Michigan Court of Appeals considered this claim on direct appeal and denied relief. The court explained:

> Defendant contends that the statement was inadmissible because defendant's right to confrontation was violated because the statement lacked any indicia of reliability. While there used to be an "indicia of reliability" requirement for a hearsay statement to satisfy the Confrontation Clause, that requirement no longer exists. *Crawford*, supra at 62-69; *People v. Eric Taylor*, 482 Mich. 368, 377; 759 N.W.2d 361 (2008). The Confrontation Clause applies, not only to in-court testimony, but also to out-of-court statements introduced at trial. *Crawford, supra* at 50-51. However, only out-of court statements that are testimonial implicate the Confrontation Clause, while nontestimonial, out-of-court statements are merely subject to the normal rules of hearsay evidence. *Id*. at 50-52, 61, 68; *Eric Taylor, supra* at 374, 377. Statements are testimonial when made under circumstances that would lead an objective declarant reasonably to believe that the statement would be available for use at a later trial. *Davis v. Washington*, 547 U.S. 813, 822; 126 S. Ct. 2266; 165 L. Ed. 2d 224 (2006); *Eric Taylor, supra* at 377-378.

> After receiving several phone calls late at night, Nelson told his girlfriend that he was leaving the apartment to meet with "Kimmy" for a few drinks. A reasonable person in Nelson's position would not have thought that the statement would be used later at a trial. It was merely a routine conversational exchange between two people who lived together. As a result, Nelson's statement to his girlfriend was nontestimonial, and the Confrontation Clause is not implicated. Therefore, any portion of defendant's argument that relies on a Confrontation Clause violation is meritless.

> Since the Confrontation Clause is not implicated, the only question remaining is whether the statement was properly admitted under Michigan's hearsay rules. The state-of-mind exception to hearsay is codified in MRE 803(3):

> A statement of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, and

28

bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation identification, or terms of declarant's will.

MRE 803(3) is consistent with the long-standing policy of admitting a homicide victim's declarations of where the victim intended to go and with whom. *People v. Furman*, 158 Mich. App. 302, 315-316; 404 N.W.2d 246 (1987). Nelson's statement of leaving to meet "Kimmy" was a statement expressing Nelson's state of mind, specifically, an intent or plan to meet "Kimmy." Thus, it is admissible as a hearsay exception under MRE 803(3).

Defendant also argues that even if Nelson's statement to his girlfriend was admissible under MRE 803(3), it should have been precluded under MRE 403 because it was "more prejudicial than probative." MRE 403, states, in pertinent part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice...." Defendant's assertion that the evidence was extremely prejudicial is insufficient to preclude its admissibility. All evidence is prejudicial or damaging to one side or the other at trial. *People v. Mills*, 450 Mich. 61, 75; 537 NW2d 909 (1995), *mod by* 450 Mich. 1212 (1995). This aspect of MRE 403 covers only unfairly prejudicial evidence. *Id.* "Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v. Ortiz*, 249 Mich.App 297, 306; 642 NW2d 417 (2001) (citation omitted). The statement indicated that Nelson had plans to meet defendant that night. This is probative because, if the plan came to fruition, it places defendant and Nelson together. However, defendant has failed to demonstrate that this evidence was given undue or preemptive weight by the jury.

*Holbrook*, 2010 WL 99010 at *3.

The state court's denial of relief is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, to the extent that Petitioner challenges the admission of the victim's statement to his girlfriend under the Michigan Rules of Evidence, he merely alleges a violation of state law which does not entitle him to federal habeas relief. *See Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *see also Wheeler*, 59 F. App'x at 28. As discussed, a federal court may only grant habeas relief to a petitioner who is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). Habeas relief

does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67-68. State courts are the final arbiters of state law and federal courts will not intervene in such matters. *Lewis*, 497 U.S. at 780; *Oviedo*, 809 F.2d at 328; *see also Bradshaw*, 546 U.S. at 76; *Sanford*, 288 F.3d at 860. Petitioner is not entitled to habeas relief based upon a perceived violation of Michigan law concerning the admission of this evidence.

Second, Petitioner fails to show that the admission of this evidence rendered his trial fundamentally unfair. The testimony was relevant and admissible as an exception to the hearsay rule under state law because it reflected the homicide victim's intent or plan to meet Petitioner on the night of the shooting and its probative value was not substantially outweighed by the risk of undue prejudice. To be sure, the Sixth Circuit has observed that the "Supreme Court has never held (except *perhaps* within the capital sentencing context) that a state trial court's admission of relevant evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012) (emphasis in original). The admission of this evidence did not violate due process.

Lastly, Petitioner fails to establish a violation of his confrontation rights. In *Crawford*, 541 U.S. at 54, the Supreme Court held that the *testimonial* statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness. Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations. Testimonial statements do not include remarks made to family members or acquaintances, business records, or statements made in furtherance of a conspiracy. *Id*. at 51-52, 56; *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005); *see also United States v.*

*Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007). Additionally, the Confrontation Clause is not implicated, and need not be considered, when non-testimonial hearsay is at issue. *Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (noting that the Confrontation Clause "has no application to such statements and therefore permits their admission even if they lack indicia of reliability"); *Doan v. Carter*, 548 U.S. 449, 458 (6th Cir. 2008). The victim's statement to his girlfriend was non-testimonial. Consequently, its admission did not implicate, nor violate, Petitioner's confrontation rights or otherwise render his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### 3. Sufficiency of the Evidence

Petitioner also asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence to support his convictions in terms of the identity of the shooter and the element of premeditation. Respondent contends that this claim lacks merit.

The federal Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson* standard must be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n. 16).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Thus, under the AEDPA, challenges to the

sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). "[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed" in the trial court. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). The "mere existence of sufficient evidence to convict ... defeats a petitioner's claim." *Id.* at 788-89.

Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *People v. Kelly*, 231 Mich. App. 627, 642, 588 N.W.2d 480 (1998); Mich. Comp. Laws § 750.316. Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170, 486 N.W.2d 312 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999). While there is no minimum time required to show premeditation under Michigan law, the time between initial thought and ultimate action should be long enough for a reasonable person to take a "second look" at the situation. *People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736 (1999). "A few seconds between the antagonistic action between the defendant and the victim and the defendant's decision to murder the victim may be sufficient to create a jury question on the

issue of premeditation." *Alder v. Burt*, 240 F. Supp. 2d 651, 663 (E.D. Mich. 2003). The elements of felony firearm are: (1) the defendant possessed a firearm, (2) during the commission of, or an attempt to commit, a felony. *People v. Akins*, 259 Mich. App. 545, 554, 675 N.W.2d 863 (2003) (quoting *People v. Avant*, 235 Mich. App. 499, 505, 597 N.W.2d 864 (1999)); Mich. Comp. Laws § 750.227b.

As with any crime, the prosecution must prove beyond a reasonable doubt that the defendant committed the offense. *People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216 (1967). Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177 (1993), including the identity of the perpetrator, *Kern*, 6 Mich. App. at 409; *see also People v. Johnson*, 146 Mich. App. 429, 434, 381 N.W.2d 740 (1985), and the defendant's intent or state of mind. *People v. Dumas*, 454 Mich. 390, 398, 563 N.W.2d 31 (1997); *see also People v. Nowack*, 462 Mich. 392, 402-03, 614 N.W.2d 78 (2000). The use of a lethal weapon supports an inference of an intent to kill. *People v. Turner*, 62 Mich. App. 467, 470, 233 N.W.2d 617 (1975).

Applying *Jackson* and the foregoing state law standards, the Michigan Court of Appeals denied relief on this claim finding that the prosecution presented sufficient evidence as to Petitioner's identity and intent to support his convictions. The court explained in relevant part:

> Defendant first contends there was insufficient evidence that he shot Nelson. However, the trial court admitted Nelson's statement, which identified defendant as the shooter through his nickname, "Kimmy." In addition to this direct evidence of defendant's guilt, there was significant circumstantial evidence. First, Nelson stated he was going to meet defendant immediately before the shooting. Second, Nelson's statement that defendant was in a green Cadillac with another black man the night of the shooting was corroborated by the testimony of Brandy Whitbread, who said someone named "Cam" stole her green Cadillac. Third, there was evidence that two black men abandoned the Cadillac immediately after the shooting. Fourth, defendant was seen walking the neighborhood streets in close proximity to the

location where the Cadillac was abandoned. Fifth, there was evidence that defendant called his girlfriend to have her drive over and pick him up. Sixth, defendant fled the state and gave a false name to police on two different occasions following the shooting. Viewing the direct and circumstantial evidence in a light most favorable to the prosecution, there was sufficient evidence to sustain defendant's conviction.

Defendant also argues that there was insufficient evidence to prove that the killing was the result of premeditation and deliberation.

\*\*\*

There was sufficient circumstantial evidence to support a finding that defendant premeditated and deliberated the killing. First, one of the seven gunshot wounds that Nelson suffered was a defensive wound to his right hand. "Defensive wounds ... can be evidence of premeditation." *People v. Johnson*, 460 Mich. 720, 733; 597 N.W.2d 73 (1999). Additionally, there was evidence that Nelson and someone using Michael Pepper's phone talked several times leading up to the murder. The calls took place at 10:09 p.m., 10:17 p.m., and 10:34 p.m. Since Nelson immediately told his girlfriend after these phone calls that he was heading out to meet "Kimmy," a jury could reasonably infer that defendant was using Pepper's phone during this time to set up the meeting. This evidence is circumstantial evidence of premeditation. Finally, "evidence that a victim sustained multiple violent blows may support an inference of premeditation and deliberation," *People v. Unger*, 278 Mich. App. 210, 231; 749 N.W.2d 272 (2008), especially when multiple volleys of gunshots are involved, *People v. Tilley*, 405 Mich. 38, 45; 273 N.W.2d 471 (1979). The existence of multiple blows or multiple volleys establishes a time lapse between the initial and subsequent attacks. *Id*. This time lapse, which can be as little as a second, can be sufficient to allow the attacker to "take a second look." *Id*. Nelson was shot seven times. As noted in the autopsy report, three shots entered Nelson's mid-to-right abdomen area and had a right-to-left, front-to-back, and downward trajectory through the body. It is reasonable to infer that, because of the proximity of these entry wounds and their similar trajectory, these shots happened at nearly the same time or came from the same volley. However, three other shots that struck Nelson's body had vastly different trajectories and entry points at the back of the victim's right rear shoulder, the front lower mid-abdomen, and the lower right back. Thus, a jury could have reasonably inferred that some time elapsed between the first group of three shots and the remaining shots, which was sufficient for defendant to have taken a second look.

Additionally, although there is no requirement mandating the establishment of a motive for the killing, *People v. Herndon*, 246 Mich. App. 371, 416; 633 N.W.2d 376 (2001), the prosecutor did proffer a theory, which supported a finding of premeditation and deliberation. The prosecution introduced evidence that Nelson's cousin, Clarence Cowen, was a "big time" drug dealer, who demonstrated an animosity regarding Nelson. There was an eyewitness who testified that a few

weeks before the shooting, Cowen was involved in a violent fight with Nelson, after which Cowen attempted to run Nelson over with a car. The prosecution supplied circumstantial evidence that defendant talked several times to Cowen immediately before the murder and again shortly after the murder. The prosecution also produced phone records that showed that after defendant was arrested, there were numerous attempts by someone at the Oakland County Jail attempting to contact Cowen. During the relevant time that defendant was in the Oakland County Jail, these calls were initiated from the same cells that housed defendant. Being placed from the jail, all of the phone calls were placed collect. Cowen did not accept any of these calls. The prosecution maintained that, after the murder, Cowen had no further use for defendant and that is why defendant's calls were refused following his arrest. When viewed alone, the evidence of the contacts between defendant and Cowen arguably is insufficient to establish beyond a reasonable doubt that an agreement between defendant and Cowen existed to murder Nelson. *See People v. Fisher*, 193 Mich. App. 284, 289; 483 N.W.2d 452 (1992) (inferences may not be based on evidence that raises merely a conjecture or possibility). However, when viewing all of the circumstantial evidence in a light most favorable to the prosecution, a jury could infer that defendant's killing of Nelson was premeditated and deliberate.

*Holbrook*, 2010 WL 99010 at *4-5.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The evidence presented at trial, viewed in a light favorable to the prosecution, established that Petitioner committed the crime and that he acted with the requisite intent. First, as to identity, the prosecution presented evidence of the victim's statements to police identifying a black man named "Kimmy," who was driving with another man in a green Fleetwood Cadillac, as the shooter, as well as evidence of the victim's statement to his girlfriend that he was meeting Petitioner on the night of the shooting. The testimony of a victim, alone, can be constitutionally sufficient to sustain a conviction. *See Tucker v. Palmer*, 541 F.3d 652, 658 (6th Cir. 2008) (citing cases). The prosecution also provided supporting evidence that "Kimmy" was Petitioner's nickname, testimony from Brandy Whitbread that a man named "Cam" took her green Cadillac, evidence that two black men abandoned the green Cadillac at a nearby gas station shortly after the shooting, and evidence that Petitioner was walking in the neighborhood

near the gas station and called his girlfriend for a ride that evening.

Additionally, the prosecution presented evidence that Petitioner fled the state and gave false names to the police after the shooting had occurred. Although the Supreme Court has expressed skepticism as to the probative value of flight evidence, *Wong Sun v. United States*, 371 U.S. 471, 483 n. 10 (1963), it has recognized that such evidence may be relevant to show consciousness of guilt. *See Allen v. United States*, 164 U.S. 492, 499 (1896) ("Indeed, the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt."); *see also Illinois v. Wardlow*, 528 U.S. 119, 124-25 (2000) (suspect's unprovoked flight from police was relevant to issue of reasonable suspicion, because "[h]eadlong flight-wherever it occurs-is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). Under Michigan law, evidence of flight is relevant and admissible to prove consciousness of guilt. *People v. Unger*, 278 Mich. App. 210, 226, 749 N.W.2d 272 (2008) (citing *People v. Goodin*, 257 Mich. App. 425, 432, 668 N.W.2d 392 (2003); *People v. Coleman*, 210 Mich. App. 1, 4, 532 N.W.2d 885 (1995)). In sum, the foregoing evidence, and reasonable inferences therefrom, was sufficient to establish that Petitioner committed the shooting.

Second, as to premeditation and deliberation, the prosecution presented evidence from the medical examiner that the victim suffered seven gunshot wounds to various parts of his body including his torso and abdomen and including one defensive wound to his hand, and the prosecution presented evidence that some of the shots came from different trajectories. The use of a gun supports an inference of the intent to kill, *see, e.g., Hudson v. Lafler*, 421 F. App'x 619, 626-27 (6th Cir. 2011); *Turner*, 62 Mich. App. 470, the firing of multiple gunshots, targeting vital organs, and different angles of injury support an inference of premeditation and deliberation, *see,*

*e.g., Thomas v. McKee*, 571 F. App'x 403, 407 (6th Cir. 2014) (multiple gunshots can establish premeditation and deliberation); *Lundberg v. Buchkoe*, 338 F.2d 62, 69 (6th Cir. 1964) (premeditation may be logically inferred from wounds to vital parts of the body under Michigan law); *Bailey v. Haas*, No. 15-CV-12727, 2018 WL 4637334, *8 (E.D. Mich. Sept. 27, 2018) (circumstances of the killing, such as multiple wounds in different areas, can support a finding of premeditation and deliberation); *Crawley v. Curtis*, 151 F. Supp. 2d 878, 888–89 (E.D. Mich. 2001) (multiple gunshots can establish premeditation and deliberation); *People v. Coy*, 243 Mich. App. 283, 315-16, 620 N.W.2d 888 (2000) (finding premeditation and deliberation, in part, because the victim suffered multiple stab wounds), and defensive wounds can be evidence of premeditation and deliberation, *see, e.g., People v. Johnson*, 460 Mich. 720, 733, 597 N.W.2d 73 (1999) (defensive wounds can be evidence of premeditation).

Additionally, the prosecution presented circumstantial evidence of premeditation, such as the multiple phone calls between the victim and another person before the shooting and testimony from Petitioner's girlfriend that he subsequently told her that he was leaving to meet "Kimmy," and the phone calls and attempted phone calls between Petitioner and Clarence Cowen, the victim's drug dealing cousin who had fought with the victim a few weeks before the shooting. The foregoing evidence, and reasonable inferences therefrom, was sufficient to show that Petitioner intended to kill the victim, that he had sufficient time to consider his actions at the time of shooting, and that he acted with premeditation and deliberation so as to support his first-degree murder and felony firearm convictions.

Petitioner challenges the jury's credibility determinations and evaluation of the evidence presented at trial. However, it is the job of the fact-finder at trial, not a federal habeas court, to

resolve such evidentiary conflicts. *Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."). The jury's verdict, and the Michigan Court of Appeals' decision affirming that verdict, were reasonable. Habeas relief is not warranted on this claim.

### 4.    Effectiveness of Trial Counsel

Petitioner further asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the prosecutor's repeated use of bad acts evidence, failing to object to repeated references to Petitioner being in custody, failing to object to the introduction of evidence that Petitioner had a probation officer and fingerprint cards, and failing to request a special cautionary instruction on a drug addict witness and perjured testimony.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide

range of professionally competent assistance." *Id*. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Petitioner first asserts that trial counsel was ineffective for failing to object to the admission of other bad acts evidence, namely that he had sold crack cocaine to Brandy Whitbread. The

Michigan Court of Appeals denied relief on this claim ruling that the evidence was properly admitted under Michigan Rule of Evidence 404(b) because it was used to show how Petitioner came to possess Whitbread's green Cadillac and was not offered as evidence of his bad character, such that trial counsel was not ineffective for failing to object to its admission. *Holbrook*, 2010 WL 99010 at *6.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Given the Michigan Court of Appeals' ruling that the evidence was properly admitted under state law, which is binding on federal habeas review, *see Bradshaw*, 546 U.S. at 76; *Sanford*, 288 F.3d at 860, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. Counsel cannot be deemed ineffective for failing to make a futile or meritless objection. *See Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2014) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."); *United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000).

Petitioner next asserts that trial counsel was ineffective for failing to object to references that he had been held in custody. The Michigan Court of Appeals denied relief on this claim ruling that testimony that Petitioner was confined in the Oakland County Jail was relevant and properly admitted under state law to show the relationship between Petitioner and Clarence Cowen (where the two men had phone calls shortly before and after the shooting, but Cowen rejected incoming phone calls from the jail after Petitioner was in custody there) in order to provide a potential motive for the shooting, such that trial counsel was not ineffective for failing to object to its admission. *Holbrook*, 2010 WL 99010 at *6.

The state court's decision is neither contrary to Supreme Court precedent nor an

unreasonable application of federal law or the facts. Again, given the Michigan Court of Appeals' ruling that the evidence was properly admitted under state law, which is binding on federal habeas review, *see Bradshaw*, 546 U.S. at 76; *Sanford*, 288 F.3d at 860, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. Counsel cannot be deemed ineffective for failing to make a futile or meritless objection. *Coley*, 706 F.3d at, 752; *Steverson*, 230 F.3d at 225.

Petitioner next asserts that trial counsel was ineffective for failing to object to testimony that Petitioner had a probation officer and fingerprint cards. The Michigan Court of Appeals denied relief on this claim. The court first found that witness Geoffrey Kaplan's statement that he was a probation officer was isolated and elicited by the trial judge, noted that Kaplan did not say that he was Petitioner's probation officer or discuss his criminal history, and ruled that trial counsel may have reasonably decided not to object to the testimony in order to avoid bringing undue attention to the issue. The court further found that the reference to Petitioner having a fingerprint card did not imply that he had a prior felony conviction because it could have just as likely concerned his current offense and ruled that trial counsel may have reasonably decided not to object to the testimony. *Holbrook*, 2010 WL 99010 at *7.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Given that the probation officer and fingerprint card remarks were brief and isolated in nature and that they did not reference Petitioner's criminal history, trial counsel may have decided not to object in order to avoid drawing further attention to those matters. Such a decision was a reasonable trial strategy which will not be second-guessed upon habeas review. *See Milner v. Hoffner*, No. 16-10127, 2017 WL 24793,

*7 (E.D. Mich. Jan. 3, 2017); *Hills v. McQuiggin*, No. 08-14354, 2012 WL 1079727, *23-24 (E.D. Mich. March 30, 2012)); *see also Robins v. Fortner*, 698 F.3d 317, 337-38 (6th Cir. 2012) (no ineffectiveness because counsel "may have ... made a tactical choice not to provide curative jury instructions to avoid drawing further attention to the fact that the pictures were mug shots"); *Stamps v. Rees*, 834 F. 2d 1269, 1276 (6th Cir. 1987) (failure to request jury instruction on permissible use of prior convictions evidence did not constitute ineffective assistance "as it is quite evident that ... counsel simply wanted to get past the prior convictions as quickly as possible without bringing undue attention to them").

Lastly, Petitioner asserts that trial counsel was ineffective for failing to request a special cautionary instruction on the consideration of drug addict witness testimony (regarding Brandy Whitbread) and perjured testimony (CJI 2d 3.6 - witness credibility). The Michigan Court of Appeals denied relief on this claim. The court first ruled that the drug addict testimony instruction was not warranted under state law because Brandy Whitbread's testimony was not the only evidence, nor the primary evidence, linking Petitioner to the crime such that trial counsel was not ineffective for failing to request that instruction. The court further ruled that the trial court gave the witness-credibility instruction such that trial counsel was not ineffective. *Holbrook*, 2010 WL 99010 at *7-8.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Given the Michigan Court of Appeals' ruling that the drug addict witness testimony instruction was not required under state law, which is binding on federal habeas review, *see Bradshaw*, 546 U.S. at 76; *Sanford*, 288 F.3d at 860, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's

conduct for failing to request that instruction. Counsel cannot be deemed ineffective for failing to make a futile or meritless request. *Coley*, 706 F.3d at, 752; *Steverson*, 230 F.3d at 225. Additionally, given the Michigan Court of Appeals' finding that the witness-credibility instruction was provided at trial, a factual finding which is presumed correct on habeas review, *see* 28 U.S.C. § 2254(e)(1), and has not been rebutted with clear and convincing evidence, *Warren*, 161 F.3d at 360-61, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct. Petitioner thus fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on these claims.

## B. Collateral Review Claims

Petitioner's remaining claims concern the absence of counsel at an unopposed motion, judicial impartiality based upon referring to the deceased as the "victim" in the jury instructions, the alleged failure to show that the shooting occurred in Oakland County to establish venue, the effectiveness of appellate counsel, the state courts' application of the good cause and actual prejudice requirements, the effectiveness of trial counsel, the conduct of the prosecutor, the trial court's question to the probation officer, and cumulative error. Petitioner first presented the claims to the state courts in his motion for relief from judgment on collateral review. Respondent contends that the claims are barred by procedural default[5] and/or that they lack merit.

### 1. Failure to Exhaust Resulting in Procedural Default

As an initial matter, the Court finds that Petitioner's remaining claims, which were first

---

[5]Respondent argues procedural default based upon Petitioner's failure to raise the claims on direct appeal and the state courts' denial of relief on collateral review pursuant to Michigan Court Rule 6.508(D)(3) because Petitioner failed to establish cause and prejudice to excuse his default or that he is actually innocent.

raised in the state courts on collateral review, have not been fully exhausted in the state courts and are now procedurally defaulted such that they cannot provide a basis for federal habeas relief.[6]

A prisoner filing a habeas petition under 28 U.S.C. §2254 must first exhaust all state remedies. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("state prisoners must give the state courts one full fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). To satisfy this requirement, the claims must be "fairly presented" to the state courts, meaning that the petitioner must have asserted both the factual and legal bases for the claims in the state courts. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *see also Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *McMeans*). The claims must also be presented to the state courts as federal constitutional issues. *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). Furthermore, each issue must be presented to both the Michigan Court of Appeals and the Michigan Supreme Court to satisfy the exhaustion requirement. *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990); *Welch v. Burke*, 49 F. Supp. 2d 992, 998 (E.D. Mich. 1999). While the exhaustion requirement is not jurisdictional, a "strong presumption" exists that a petitioner must exhaust all available state remedies before seeking federal habeas review. *Granberry v. Greer*, 481

---

[6]The Court notes that although Respondent did not raise this specific procedural default argument, the Court has discretion to *sua sponte* raise the issue of procedural default. *See Lovins v. Parker*, 712 F.3d 283, 295 (6th Cir. 2013); *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005); *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004); *see also Wood v. Milyard*, 566 U.S. 463, 465 (2012) ("a court may consider a statute of limitations or other threshold bar the State failed to raise in answering a habeas petition"); *Cradler v. United States*, 891 F.3d 659, 665-66 (6th Cir. 2018) (same). Moreover, given the state courts' procedural rulings and the fact that Respondent raised procedural default in the context of Michigan Court Rule 6.508(D)(3), Petitioner had the opportunity to, and did, address the issue of procedural default in his pleadings.

U.S. 129, 131, 134-35 (1987). The burden is on the petitioner to prove exhaustion. *Rust*, 17 F.3d at 160.

Petitioner did not properly exhaust his remaining habeas claims in the state courts. While he raised those claims in his motion for relief from judgment before the state trial court and then filed a delayed application for leave to appeal with the Michigan Court of Appeals, he did not timely seek leave to appeal with the Michigan Supreme Court. While the prison mailbox rule applies in criminal appeals filed by prisoners, *see* Mich. Ct. Rule 7.305(C)(2) (as of March 1, 2010), there are no exceptions to the 56-day time limit for seeking leave to appeal in the Michigan Supreme Court. *See* Mich. Ct. R. 7.305(C)(2), (5). Petitioner's remaining habeas claims, those first presented on collateral review in the state courts, are therefore unexhausted. Moreover, Petitioner no longer has an available means by which to exhaust those claims since he has already filed a motion for relief from judgment with the state trial court. Any attempt to file a second motion for relief from judgment would be futile. Under Michigan Court Rule 6.502(G)(1), a state criminal defendant is generally permitted to only file one post-conviction motion for relief from judgment. *Gadomski v. Renico*, 258 F. App'x 781, 783 (6th Cir. 2007); *Hudson v. Martin*, 68 F. Supp. 2d 798, 800 (E.D. Mich. 1999). Petitioner's remaining claims do not fall within the exceptions for filing a second motion, *see* Mich. Ct. R. 6.508(G)(2) (exceptions include a retroactive change in the law or newly-discovered evidence and waiver of the rule due to a significant possibility of innocence).

Because Petitioner has not fully exhausted his remaining habeas claims in the state courts and no longer has an available remedy by which to do so, those claims are now procedurally defaulted. When a habeas petitioner fails to properly present a claim to the state courts and is barred from pursuing further relief under state law, he or she has procedurally defaulted that claim

for purposes of federal habeas review. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (citing *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002)).

Federal habeas relief is precluded on claims which have not been presented to the state courts in accordance with the state's procedural rules. *Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977). A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996). To establish cause, a petitioner must establish that some external impediment frustrated his or her ability to comply with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A petitioner must present a substantial reason to excuse the default. *Amadeo v. Zant*, 486 U.S. 214, 223 (1988).

Petitioner fails to demonstrate cause to excuse this procedural default. Any alleged failings by appellate counsel with regard to his direct appeal do not excuse Petitioner's failure to properly exhaust his claims in the Michigan Supreme Court on collateral review. Moreover, a prisoner's pro se status or lack of knowledge about state court rules does not constitute cause to excuse a procedural default. *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995); *Robertson v. Abramajtys*, 144 F. Supp. 2d 829, 838 (E.D. Mich. 2001). Because Petitioner fails to establish sufficient cause to excuse his procedural default, the Court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Lastly, Petitioner fails to demonstrate that a fundamental miscarriage of justice has

occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of someone who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 479-80 (1986). To be credible, a claim of actual innocence requires a petitioner to support the allegations of constitutional error with new reliable evidence that was not presented at trial. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Actual innocence means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998).

Petitioner makes no such showing. His contention that his claims have merit does not establish his actual innocence and his own self-serving, conclusory assertions of innocence are insufficient to support an actual innocence claim. "A reasonable juror surely could discount [a petitioner's] own testimony in support of his own cause." *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007) (citing cases). Petitioner fails to show that he is actually innocent. His remaining habeas claims, those first raised on collateral review in the state courts, are thus barred by procedural default and do not warrant federal habeas relief.

### 2.    Procedural Default under Michigan Court Rule 6.508(D)(3)

As noted, Respondent contends that Petitioner's remaining claims, other than the ineffective assistance of appellate counsel claim, are procedurally defaulted based upon Petitioner's failure to raise the claims on direct appeal and the state courts' denial of relief on collateral review pursuant to Michigan Court Rule 6.508(D)(3) because Petitioner failed to establish cause and prejudice to excuse his default or that he is actually innocent. The Court finds that this rationale provides an alternative, and additional reason, that the remaining claims, other than the ineffective assistance of appellate counsel claim, are procedurally defaulted such that they cannot provide a basis for federal habeas relief.

As noted, federal habeas relief may be precluded on a claim that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *Wainwright*, 433 U.S. at 85-87; *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). The doctrine of procedural default applies when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *White v. Mitchell*, 431 F.3d 517, 524 (6th Cir. 2006); *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005); *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir. 2001). "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 263-64 (1989). The last explained state court ruling is used to make this determination. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).

Petitioner first presented his remaining claims to the state courts in his motion for relief from judgment. The Michigan Court of Appeals rendered the last decision on the claims and denied relief pursuant to Michigan Court Rule 6.508(D), which provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom. *See* Mich. Ct. R. 6.508(D)(3). The Sixth Circuit has held that the form order used by the Michigan Court of Appeals to deny leave to appeal in this case is unexplained because the citation to Michigan Court Rule 6.508(D) is ambiguous as to whether it refers to a procedural default or a rejection on the merits. *Guilmette v. Howes*, 624 F.3d 286, 291-92 (6th Cir. 2010) (en banc); *see also Wilson v. Sellers*, _ U.S. _, 138 S. Ct. 1188, 1193-94 (2018) (ruling that, in reviewing the basis for a summary appellate

order of affirmance, a habeas court should apply *Ylst* and "look through" the unexplained order to the last reasoned state court decision). Consequently, under *Guilmette*, the Court must "look through" the unexplained order of the Michigan Court of Appeals to the state trial court's decision to determine the basis for the denial of state post-conviction relief.

In this case, the state trial court denied relief on procedural grounds by ruling that Petitioner had not shown cause and actual prejudice under Michigan Court Rule 6.508(D)(3) for his failure to raise the claims on direct appeal of his convictions. The state courts thus clearly relied upon a procedural default to deny Petitioner relief on these claims. Accordingly, the claims are procedurally defaulted.

As discussed *supra*, a state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 753; *Gravley*, 87 F.3d at 784-85. To establish cause, a petitioner must establish that some external impediment frustrated his or her ability to comply with the state's procedural rule. *Murray*, 477 U.S. at 488. A petitioner must present a substantial reason to excuse the default. *Amadeo*, 486 U.S. at 223. Such reasons include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available. *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).

Petitioner asserts ineffective assistance of appellate counsel as cause to excuse this default. In order to establish ineffective assistance of counsel, a petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense."

*Strickland*, 466 U.S. at 687; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). In determining whether counsel's performance was deficient,

> [t]he court must ... determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance .... At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland,* 466 U.S. at 690. Judicial scrutiny of counsel's performance is thus "highly deferential." *Id*. at 689. The defense is prejudiced only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the … goal of vigorous and effective advocacy …. Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id*. at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52). As the Supreme Court has explained, "it is difficult" to demonstrate the incompetence of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002); *see also Robbins*, 528 U.S. at 288 (citing

50

a Seventh Circuit case for the same proposition). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

In this case, Petitioner fails to show that by omitting the claims presented in his motion for relief from judgment, appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel raised substantial claims on direct appeal including claims challenging the admission of the victim's statements to police implicating Petitioner in the shooting (the most damaging evidence against Petitioner), the victim's statement to his girlfriend (which placed Petitioner with the victim near the time of the shooting), and the sufficiency of the evidence (which challenged both the identity and intent elements needed to support Petitioner's convictions). None of the defaulted claims are clearly stronger than those raised by counsel nor are they "dead-bang winners." To be sure, Petitioner did not raise the claims on direct appeal himself despite filing his own supplemental brief. *See, e.g., Jones v. Palmer*, No. 2:13-CV-13864, 2016 WL 98157, *9 (E.D. Mich. Jan. 8, 2016) (petitioner's failure to raise defaulted claims in his supplemental brief on appeal undermines assertion of cause and prejudice to excuse procedural default); *Rockwell v. Palmer*, 559 F. Supp. 2d 817, 834 (W.D. Mich. 2008) (petitioner did not show cause for his failure to raise a defaulted claim on direct appeal where he had filed briefs on his own behalf raising other claims that had not been asserted by his appellate counsel, but offered no explanation for his failure to raise the defaulted claim at the same time).

Moreover, even if appellate counsel erred in some way, Petitioner cannot show that he was prejudiced by appellate counsel's conduct (or demonstrate prejudice to excuse the procedural

default) because the defaulted claims lack merit for the reasons discussed by Respondent. *See* Resp. Ans., pp. 70-109. Appellate counsel cannot be deemed ineffective for failing to raise issues that lack merit. *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010). Petitioner fails to establish that appellate counsel erred and/or that he was prejudiced by counsel's conduct as required by *Strickland*. He thus fails to establish cause and prejudice to excuse his procedural default.

Lastly, as discussed *supra*, Petitioner also fails to demonstrate that a fundamental miscarriage of justice occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Murray*, 477 U.S. at 479-80. To be credible, such a claim requires a petitioner to provide new, reliable evidence that was not presented at trial. *Schlup*, 513 U.S. at 324 Moreover, actual innocence means factual innocence, not mere legal insufficiency. *Bousley*, 523 U.S. at 623. Petitioner makes no such showing. His remaining habeas claims, those that were first presented on collateral review in the state courts, other than the ineffective assistance of appellate counsel claim, are thus barred by procedural default, lack merit, and do not warrant habeas relief.

3.    Effectiveness of Appellate Counsel

Petitioner also raises an independent claim that appellate counsel was ineffective for failing to raise the foregoing collateral review claims on direct appeal. Respondent contends that this claim lacks merit.

The state trial court denied relief on this claim on collateral review indicating that Petitioner failed to show that appellate counsel was ineffective. *Holbrook*, No. 07-218017-FC at *4-5. The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable

application of federal law or the facts.[7] The ineffective assistance of appellate counsel claim, while not itself procedurally defaulted, nonetheless lacks merit. As discussed, Petitioner fails to establish that appellate counsel was ineffective under the *Strickland* standard as counsel raised significant issues on direct appeal and the defaulted claims are neither clearly stronger than those claims nor "dead-bang winners" as they lack merit. As noted, appellate counsel cannot be deemed ineffective for failing to raise issues that lack merit. *Moore*, 708 F.3d at 776; *Shaneberger*, 615 F.3d at 452. Habeas relief is not warranted on this claim.

## V.  CONCLUSION

Based on the foregoing discussion, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal, a certificate of appealability must issue. 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may be issued only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the constitutional claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). When a court denies relief on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would

---

[7]To the extent that the trial court's decision on this issue could be seen as unclear, the Court notes that it would reach the same result under a *de novo* standard of review.

find it debatable whether the court was correct in its procedural ruling. *Id*. Having considered the matter, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his claims and jurists of reason would not find the Court's procedural ruling debatable. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal from this decision cannot be taken in good faith. Accordingly, the Court also **DENIES** Petitioner leave to proceed *in forma pauperis* on appeal. *See* Fed. R. App. P. 24(a).

**IT IS SO ORDERED**.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 27, 2020